**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SHERRY A. LAWSON, | ) |
| | ) |
|        Plaintiff, | )  Case. No. 10 C 6851 |
|     v. | ) |
| | )  Magistrate Judge |
| Michael J. Astrue, | )  Arlander Keys |
| Commissioner of Social | ) |
| Security | ) |
|        Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

On March 3, 2006, Sherry Lawson filed applications for
Disability Insurance Benefits and Supplemental Security Income,
arguing that she had become disabled as of that date because of
back pain. Her requests for both DIB and SSI were denied on
August 4, 2006. Record at 51-55, 56-59. On August 31, 2006, she
requested a hearing before an administrative law judge. ALJ B.
Lloyd Blair held the requested hearing in Lansing, Michigan on
December 2, 2008. Ms. Lawson appeared, represented by counsel,
and testified; the ALJ also heard testimony from a Vocational
Expert.

Ms. Lawson, who was 45 at the time of the hearing, testified
that she was 5'5" and weighed about 220 lbs. Record at 25. She
testified that she had a driver's license and sometimes drove;
she did not attend college but completed 12th grade. Record at
25. She testified that she is able to read and write, and that

she is right handed. Record at 28. She testified that she is single and lives in a one-story house with her two kids, ages 17 and 13. Record at 33. She testified that she is able to cook sometimes and shop for groceries with her kids, but that she does not do laundry or any yard work. Record at 33. She has no hobbies, but attends church every Sunday. Record at 34. She testified that she is unable to climb stairs because she gets out of breath, that she cannot squat or bend over. Record at 34. She testified that, in a typical day, she gets up around 7:00 a.m., helps her daughter get ready for school, takes her medication and lays down. Record at 34-35. She testified that, most of the time, she elevates her leg, lays down and rests. Record at 35.

With regard to her work history, Ms. Lawson testified that she worked at John's Countryside for about 5 months, and that, before that, she worked at Jackson County Medical Care Facility as a dietary aide. Record at 26. She testified that she held the dietary aide job for about 4.5 years; that job involved lifting as much as 20 lbs. and pulling. Record at 26. Prior to that, she testified, she worked for Georgia-Pacific as a forklift driver for about 2.5 years, a job that involved both sitting and standing, as well as lifting as much as 20 or 30 lbs. Record at 27. Prior to that, she worked for Robertson Transformers in Blue

Island for 11 years; that job, she testified, involved lifting as much as 20 or 30 lbs. Record at 27-28.

Ms. Lawson testified that she has been disabled since March 3, 2006 and that she has not worked since that date. Record at 28. When asked why she is unable to work, Ms. Lawson testified: "I have breathing trouble. I'm on an oxygen CPAP. I've got to use that every night. A back injury, I've got a disc – [degenerative] disc disease. I have a broken screw inside – ankle of my left foot. And I have high blood pressure. And asthma." Record at 29. She testified that her high blood pressure was diagnosed the year before the hearing (2007) and that she takes medication, but it still "goes up and down." Record at 29. She testified that she started using a CPAP machine in 2006. Record at 29. She testified that her back problems have been around since 2006, that she has had physical therapy – most recently in 2007 – and "shots" but that none of that helped. Record at 30. She testified that she has not had back surgery and that no one has suggested that she should have surgery at this time. Record at 30.

With regard to her back pain, Ms. Lawson testified that it is constant at a level of 8/10, below the belt line and in one spot. Record at 30. When asked by the ALJ whether her pain moved, she testified that it did not. Record at 30. She testified that there is nothing she can do to relieve the pain.

3

Record at 31. She takes "Vicodin 750, extra strength." Record at 31.

She testified that, in addition to her back, she has problems with her ankle; she testified that she is being treated for her ankle by Dr. Keys, and that she is supposed to have surgery on it soon. Record at 31. She testified that she started using a cane to walk in 2007, after it was prescribed by Dr. Davis. Record at 31.

Additionally, she testified that she was diagnosed with asthma in 2007, and that she uses an inhaler and a nebulizer about once or twice a week; she testified that she has never been hospitalized for her asthma. Record at 32. She testified that she has smoked for more than 15 years; she testified that she has been advised to quit, but still smokes three cigarettes a day. Record at 33.

With regard to her daily life, Ms. Lawson testified that she could not even lift a gallon of milk, but might be able to lift a box of kleenex. Record at 35. She testified that she could stand for about 15 minutes before she would need to sit down. Record at 35. She testified that she could walk less than a block before she got short of breath. Record at 36. On questioning from her lawyer, she testified that she could sit for longer periods, but that she would have to "fidget"; she testified that, when she sits, her foot swells up, her ankle

swells up and her lower back hurts. Record at 36. She testified that her pain radiates down from her low back into her left ankle. Record at 38. She testified that she used to skate and bowl, but that she is no longer able to do those activities; she testified that she has not skated or bowled in five or six years. Record at 40.

She testified that her back pain is "numbly, tingling and pulling, throbbing, scratching." Record at 40. She testified that her doctor told her to do some stretching exercises, but that she is unable to do them because of pain. Record at 41. She testified that she uses the nebulizer when she's "breathing funny, running up, like, going up and down the steps." Record at 42. She testified that the nebulizer does not help, nor does resting or elevating her leg. Record at 43. She testified that the pain in her ankle is constant and that it feels like "something is pulling it and twisting it, and my foot going crooked, and I'm always going crooked . . . ." Record at 43.

Next, the ALJ heard testimony from Dr. Chandra Donnell, who testified as a Vocational Expert. Dr. Donnell testified that she had reviewed the exhibits in Ms. Lawson's file, that she had familiarized herself with Ms. Lawson's vocational background, and that she had listened to the testimony at the hearing. Record at 44. Based upon all of that, Dr. Donnell characterized Ms. Lawson's past work as follows:

There is a position as food service worker. It is an unskilled position, with an SVP of 2, classified at the medium exertion level. There is also a position as an industrial truck operator. It is a semi-skilled position, with an SVP of 3, classified at the medium exertional level. There is a position as a housekeeper. It is an unskilled position, with an SVP of 2, classified at the medium exertion level, although likely performed at the light exertion level by the Claimant. And there's a position as an assembly machine operator., it is an unskilled position, with an SVP of 2, classified at the light exertional level. Likely performed between light and medium by the Claimant.

Record at 45. The ALJ then asked the VE whether a hypothetical individual who could meet the demands of light work, who would require a sit/stand option at will, should never use ladders, scaffolds or ropes, should only occasionally use ramps, stairs, stoop, kneel, crouch or crawl, should do no commercial driving and never use a left foot pedal, could perform any of the past relevant work; the VE testified that she could not. Record at 45-46. The ALJ then asked the VE whether, assuming the Claimant's vocational profile relative to age, education and work history, there would be other jobs that such hypothetical person could do, and the VE testified that there were. Record at 46. More specifically, the VE testified that, in the state of Michigan, there were jobs existing in significant numbers that the hypothetical person described above could do – for example, there were about 4,000 mail clerk jobs in the region (an unskilled position, with an SVP of 2, classified at the light exertion level); there were about 9,000 retail marker jobs (an

6

unskilled position with an SVP of 2, classified at the light exertion level); and there were about 42,000 bench assembler jobs (an unskilled position with an SVP of 2 classified at the light exertion level). Record at 46-47. The VE testified that her testimony was consistent with the Dictionary of Occupational Titles, except with regard to her testimony about the sit/stand option, which the DOT did not account for. Record at 47. She testified that, in responding the ALJ's question, in addition to the DOT, she also relied upon "the national and statewide occupational employment forecast [and] her prior professional experience as a job placement and development specialist." Record at 47.

Finally, the VE testified that, if Ms. Lawson's testimony were taken at face value, if she were deemed to be completely truthful in all respects, she could not perform her past work and could not perform any other jobs existing in significant numbers in the national economy. Record at 47. Ms. Lawson's attorney was given an opportunity to question the VE, but declined to ask any questions. Record at 47.

In addition to the testimony of the live witnesses, the ALJ also had before him various medical records and evaluations. Taking the latter first, the record shows that, on June 9, 2006, Ms. Lawson was examined by Dr. Bharti Sachdev, at the behest of the SSA. At that time, Ms. Lawson's chief complaints were "low

back pain since 2000"; "right supraclavicular area fullness
detected recently"; and "[h]istory of sleep apnea diagnosed one
year ago." Record at 144. She reported that she "quit working
in 2004 because she was terminated at work." Record at 144. She
also reported that she

> started having pain in the lower back in 2000 which has
> been progressively getting worse and is now constant.
> She describes it as a pulling sensation in the lower
> back with radiation of this pain to the right hip and
> right lower extremity if she stands for more than one
> hour.

Record at 144. At that time, she rated her pain at a 10/10 and
reported that she was taking Vicodin. Record at 144-145. And
she reported that walking had gotten difficult over time, though
she clarified that this was more because of breathing issues than
because of pain; she reported that she has to stop after half a
block. Record at 144. She reported that "her whole body is
sore"; that she was "aware of a feeling of fullness and swelling
in the right supraclavicular area since this Christmas"; that she
had "some pain across her midchest which will occur every few
days and last for 15 to 20 minutes; that she had "choking during
the night" and, after a sleep study was diagnosed with sleep
apnea. Record at 144. Finally, she also reported being
depressed for the past 5 to 10 years. Record at 144. She
reported that she smoked 3 cigarettes per day. Record at 145.

On physical examination, Dr. Sachdev noted that Ms. Lawson
was "morbidly obese" with an elevated body mass index of 27

kg/m²; Dr. Sachdev noted that "there is a significant element of deconditioning." Record at 145. The doctor also noted that there was "some depression" and that Ms. Lawson was "very emotional", that she was using a lot of Motrin and Advil for pain, that her chest pain "seems to be atypical and may be related to nonsteroidal anti-inflammatory during related acid reflux." Record at 145.

On July 12, 2006, Ms. Lawson was examined and evaluated by Dr. Thomas M. Horner, Ph.D., who conducted a Mental Status Examination at the behest of the SSA. *See* Record at 157-177. With regard to her personal history, Ms. Lawson reported that she had two children, had never been married, and had a lot of friends in Chicago. Record at 158. She reported that she relocated from Chicago to Jackson, Michigan to join her sister, after losing her job with Georgia-Pacific in Chicago; she reported that she was let go because of excessive absences relating to her daughter's illnesses. Record at 157. She reported that, since moving to Michigan, she had held and lost two jobs – one at a retirement center, after being accused by a dementia patient of trying to borrow money (which she emphatically denies), and one from a nursing facility after she gave a patient soup without being authorized to do so. *Id.* She reported feeling "stuck" in Jackson because of "her Section 8 situation and restrictions" and wanted to return to Chicago to be

closer to her father. Record at 158. She reported that she liked the people at church and felt like she got along with everybody; that she likes to skate, bowl and dance, but had not been able to do much of any of these because of her back pain; and that she now stays home a lot because she doesn't have money to go out; she keeps house, does some cooking and laundry (with assistance), grocery shops, watches tv and movies. Record at 158. She reported feeling generally unhappy because of her pain, and also because she missed her dad and her friends in Chicago. *Id.*

After examining and interviewing Ms. Lawson, Dr. Horner diagnosed her, according to the DSM-IV, as follows:

```
Axis I:   adjustment disorder, depressed mood, health,
          economic, and missing living in Chicago (309.0);
Axis II:  none
Axis III: back pain
Axis IV:  financial stressors
Axis V:   60[1]
```

Record at 162. He found her to be personable, cooperative, communicative, and articulate; determined her capable of focused and sustained attention/concentration and capable of managing her own funds; and characterized her prognosis as "stable." Record at 157, 162.

---

[1] A 60 at Axis V, the Global Assessment of Functioning score, indicates moderate symptoms OR moderate difficulty in social, occupational or school functioning. DSM-IV, p. 32. 60 is the highest score in that range, just one shy of the range indicating "some mild symptoms OR some difficulty" in functioning, but generally functioning pretty well . . . ." *Id.*

On August 3, 2006, Dr. Dennis Beshara completed a Psychiatric Review Technique form for Ms. Lawson covering the period beginning March 1, 2006 and ending the date of the assessment. According to Dr. Beshara, Ms. Lawson suffered from "adjustment disorder with depression"; he also checked the box noting that she suffers from "Coexisting Nonmental Impairment(s) that Requires Referral to Another Medical Specialty." Record at 164, 167. With regard to functional limitations, Dr. Beshara determined that Ms. Lawson was mildly limited in her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace, but was otherwise not limited; he determined that she had no episodes of decompensation. Record at 174.

The record also includes medical documentation from entities that treated Ms. Lawson for her back issues and her lower extremity issues, and for her sleep apnea. With respect to her back pain and lower extremity pain/swelling issues, the record shows that Ms. Lawson saw Suzanne Kirk, a nurse practitioner, on November 9, 2004, complaining of "chronic pain in her back for the last year." Record at 205. She also complained of swelling in her lower extremities, joint pain that occurs in her low back, waist, and her feet, as well as her lower extremities. *Id.* Ms. Lawson reported that she had had x-rays and MRIs of her LS spine and C-spine, which have shown no abnormalities, except for some

mild degenerative changes; she reported feeling like she's not able to participate in her life and wanted it all to go away. Record at 205. Upon examination, she was noted to have "full active range of motion both in her C-spine, thoracic spine and LS spine"; straight leg test was negative. Record at 205. The nurse ordered "a battery of tests" and advised her to return in two weeks. *Id.*

Ms. Lawson returned for a follow up visit with Suzanne Kirk on November 23, 2004. Record at 204. According to progress notes, Ms. Lawson underwent x-rays to investigate her swelling and pain complaints, and the x-rays of her back "all came back negative." *Id.* Blood work was done, but results were not accessible at this visit. *Id.* Ms. Lawson reported continued "back pain as well as migratory joint pain in all areas," and she requested Valium. Record at 204. The nurse recommended that Ms. Lawson get an MRI of her C-spine and follow up in one month; she also prescribed Valium as needed at night, but advised Ms. Lawson not to take it every day because of the potential for addiction. *Id.* According to the notes from this visit, Ms. Lawson reported that she was also undergoing evaluation and treatment at Cook County Hospital in Chicago. *Id.*

The record also includes progress notes and test results from the spring of 2005 (March, April and June) and the spring of 2006 (March and May), which indicate that Ms. Lawson was

complaining of back and leg pain, swelling in her feet and a lack of sleep. Record at 140-143 (March 9, 2005); 135 (April 13, 2005); 133 (June 15, 2005); 132 (March 29, 2006); 131 (May 7, 2006).[2] After that initial appointment, she also had x-rays and blood work done. The record shows that Ms. Lawson had a chest x-ray on March 10, 2005, which revealed "[n]o acute cardiopulmonary process" and showed that a lump on her right clavicle was not apparent in the x-ray. Record at 139.

The record shows that Ms. Lawson had an x-ray of her lumbar spine on May 26, 2005, which revealed "[m]inimal anterior degenerative spurs at L3 and L4" and "[n]o significant narrowing of the intervertebral spaces"; Dr. S.T. Reddy, who reviewed the x-rays, noted that "[p]edicles, articular facets and facet joints appear normal." Record at 130, 134. Dr. Reddy also noted that, [c]ompared to previous examination on 3/19/04, scoliosis is reduced . . . ." Record at 130, 134.

The record shows that Ms. Lawson saw Dr. Rose Johnson, who appears to be affiliated with Suzanne Kirk, on December 15, 2006 to address "a few concerns"; at that time, she complained of swelling in her legs – usually when she sits; back pain; and an inability to sleep at night. Record at 203. On examination, Dr. Johnson noted that "straight leg raising test is negative but movement of the hips bilaterally causes her discomfort in her

---

[2]   These records presumably come from Dr. Davis' office, though his name does not appear on any of them.

lower back." Record at 203. She noted that Ms. Lawson had "no swelling at this time" and that the swelling "could be second to obesity." *Id.* Dr. Johnson ordered an MRI to investigate the lower back pain and advised Ms. Lawson to follow up on that issue; the doctor also advised her to quit smoking. *Id.*

Ms. Lawson returned to Dr. Johnson on January 23, 2007 for follow up on test results. Record at 202. At that time, she continued to complain of back pain and requested medication to help alleviate her pain; Dr. Johnson referred her for physical therapy but declined to prescribe any medication because what she had tried in the past had not helped. Record at 202. Dr. Johnson did give her some hydrocortisone to help with her eczema. Record at 202.

On June 4, 2007, Ms. Lawson underwent a whole body scan to address her complaints of chronic back pain and bilateral swelling in her ankles. Record at 223.[3] The notes from that scan show that, with respect to her lumbar spine, mild degenerative changes were noted, but there was no evidence of any fracture or dislocation; the test findings showed that she may have had a stress fracture of the left mid-tibial shaft, as well as degenerative changes in her knee, shoulder and left elbow

---

[3] The test record shows that it was ordered by Dr. Horace Davis, DO, who is referred to elsewhere in the record as Ms. Lawson's family physician; as noted above, there are a few records which the Court assumes come from Dr. Davis' office, though his name is not explicitly mentioned anywhere on those records.

joints; she may also have had some issues with the surgical hardware from her left ankle surgery. Record at 224, 249-250.

On July 28, 2007, Ms. Lawson saw Dr. Marc Keys, D.P.M., for "swelling and pain in her left foot." Record at 246. At that time, Ms. Lawson reported that her foot pain and swelling had been going on since 2004, and that she also "has back problems which cause pain down her left leg." *Id.* She reported that the pain "starts in her back and goes down her left leg" she experiences "numbness and burning down the lateral aspect of her left leg into the calf region into the foot." *Id.* She reported that she had a history of a fracture of her left ankle, that she had surgery to remove a screw, but still had part of the screw in her ankle; she reported having a bone scan and ankle x-rays and asked Dr. Keys to review them and to help develop a treatment plan. Record at 246. At that initial appointment with Dr. Keys, Ms. Lawson also reported having difficulty breathing and using a CPAP machine at home to address that difficulty; she reported a history of high blood pressure and admitted to taking blood pressure medication, as well as Vicodin; she denied smoking or drinking alcohol. Record at 246. On examination, Ms. Lawson had "pain upon attempted range of motion within the left ankle joint." *Id.* Dr. Keys diagnosed her with "seral nerve problems with numbness in the left foot and pain in the left foot; arthritis of the left ankle secondary to trauma; equinus

deformity." Record at 246. After reviewing the x-rays taken at Foote Hospital, Dr. Keys noted that there "is a piece of screw . . . in the tibia"; "some slight changes in the talus of the left ankle as well as narrowing of the joint space along the tibia talar region." Record at 246. He determined that there was "the possibility that the screw is partially causing some of her problems on the lateral view of the x-rays." *Id.* Dr. Keys discussed with Ms. Lawson the possibility of seeing a neurologist to evaluate her sciatic nerve because "no matter what we do down on her foot, if she is having problems with the sciatic this would prevent us from trying to resolve her problem." Record at 247. He also taped her left foot and ankle and, at her request, gave her a prescription for Vicodin ES.[4] *Id.*

On August 4, 2007, Ms. Lawson returned to Dr. Keys' office and saw Dr. Kristi Ledbetter, an associate of Dr. Keys, for "continued care of painful left foot." Record at 245. At that time, Ms. Lawson reported that the "taping helped some." *Id.* She also reported that she planned to see a neurologist and to return to see her family physician, Dr. Davis. *Id.* On examination, Ms. Lawson was still having "tenderness following the lines of the tibial nerve and the posterior tibial tendon posterior to the medial malleolus and extending just slightly as the tibial tendon wraps into the plantar foot." *Id.* Dr.

---

[4] "ES" denotes Extra Strength.

Ledbetter recommended fitting Ms. Lawson for "Biomechanical orthoses" to "try to support that left foot and hopefully take pressure off of the back as well." Record at 245. In the meantime, Dr. Ledbetter told Ms. Lawson that she could return for "serial tapings to keep the area offloaded." *Id.*

On August 14, 2007, Ms. Lawson underwent an MRI at Foote Hospital in Jackson, Michigan, because of "[n]eck pain, mostly on the right side/right arm with spasms on and off for one year." Record at 222. The test revealed "a bridging osteophyte anteriorly at C5-C6 without associated disc space narrowing"; the oblique views showed "no encroachment upon the neural foramina." Record at 222.

On August 27, 2007, Ms. Lawson saw Dr. Keys for "dispensement of custom-made orthotics." Record at 244. At that time, she was "still complaining about a lot of pain in her left extremity"; she reported that she was unable to get in to see her back specialist until early December, and requested additional pain medication. Record at 244. Dr. Keys prescribed Vicodin ES and told Ms. Lawson that "this was the last time I will give her any pain medication because I believe this problem is stemming from her back." Record at 244. He advised her to return in one month for a follow-up and re-evaluation. *Id.*

She returned to Dr. Keys, as advised, on September 24, 2007, for "re-evaluation of posterior tibial tendinitis," as well as

"chronic pain in her left foot and left lower leg." Record at 235. At that time, Ms. Lawson reported that she had an appointment with a neurologist scheduled for December. *Id.* Dr. Keys discussed that he thought Ms. Lawson's pain "may be a sciatic problem causing her foot pain" and noted that he "would be willing to give her one more prescription for pain medication because of severe pain"; he gave her a prescription for Vicodin ES. Record at 235.

Dr. Davis referred Ms. Lawson to the Center for Pain Management at Foote Hospital, and she went there on October 3, 2007, complaining of low back and bilateral leg pain. Record at 225. At that time, she was examined by Dr. Michael Sheth and reported having back pain since at least 2004; she reported that she first noticed it when she was "pulling on heavy carts [while] working as a dietary aide." *Id.* She described her pain as "sharp" and constant at a level of 10/10, with 10 indicating unbearable pain; she reported that her pain radiated down both legs, causing her feet to swell. Record at 225. She also reported that her pain affected her ability to sleep, noting that she is typically in bed for about 12 hours, but sleeps very erratically. *Id.* She reported that her pain is made worse with "sitting, standing, or lying in one position for any length of time, walking, physical activity or bending over"; "[r]elieving factors have not been identified," though she conceded that "some

medicines might help a little bit." Record at 225. She reported that she had tried physical therapy, but "did not find that very helpful" and that she had tried various medications – from Advil, Aleve and Motrin to Vicodin – and none of them helped very much; she reported that Vicodin gave her "a little relief for about 2 hours." Record at 225-226. Dr. Sheth noted that an MRI from 02/07 "was within normal limits"; he also noted the results from her past x-rays and her full body scan. On examination, he noted that her "gait was within normal limits"; that she was "unable to heel walk, toe walk, or squat due to pain in her left foot"; that she had good range of motion in her cervical spine and no tenderness; that she was "tender to palpation in the mid to lower lumbar area; that "[s]eated leg raise to 90 degrees on the left exacerbated her low back pain and left foot pain, to 90 degrees on the right did not produce pain"; that "[s]upine leg raise to 30 degrees on the left increased her low back and left leg pain, to 45 degrees on the right also increased her low back pain; and that "Patrick's" was "pos. bilaterally for low back pain." Record at 227. Dr. Sheth recommended that she schedule "a lumbar epidural steroid, left lumbar facet, and left SI injection." Record at 228. He also recommended that she schedule an evaluation with the clinical psychologist at his facility. *Id.*

On October 15, 2007, Ms. Lawson returned to Dr. Sheth for

epidural steroid injections; there were no complications and Ms. Lawson tolerated the procedure well.  Record at 219-221.

On October 18, 2007, she returned to the Center for Pain Management; at that time, she rated her pain at a 7/10; she reported that she had "good and bad days" and that she was "functioning relatively well."  Record at 233.  She reported that she did not think the epidural, facet and sacroiliac joint injections had "helped her that much."  Record at 233.  Dr. Sheth noted that "[p]alpation of the back does not reproduce any pain" and that Ms. Lawson was "able to ambulate from a sitting position with minimal difficulty"; he noted that he did not "have much else to offer her."  Record at 233.

On October 20, 2007, Ms. Lawson underwent an MRI of her lumbar spine; no significant interval changes were noted since the 3/26/04 MRI.  Record at 231.

On November 1, 2007, Ms. Lawson returned to the Center for Pain Management for a follow up after her epidural; at that time, she rated her pain at an 8/10 and reported having "good and bad days"; she also reported that she did not think that the injections helped.  Record at 229.  Dr. Sheth reported that he went over the MRI results, "which were essentially negative" and advised Ms. Lawson that he did not "have anything else to offer her"; he referred her back to her family doctor.  Record at 229.

On November 8, 2007, Ms. Lawson returned to Dr. Ledbetter with continued complaints of left foot pain. Record at 243. On examination, Ms. Lawson had "significant tenderness to the left foot in the area of the tarsal tunnel with a positive Tinel's sign"; she had trouble going up on her toes on the left side and walked with an antalgic gait. Record at 243. Dr. Ledbetter gave her an injection to alleviate her ankle pain and advised her to follow up after having an MRI and seeing a neurologist, which she was scheduled to do in early December, 2007.

On November 24, 2007, Ms. Lawson returned to Foote Hospital for x-rays and imaging of her left ankle. The MRI revealed a "6 mm osteochondral lesion in the medial aspect of the talar dome," but there was "no evidence of acute fracture, dislocation or other acute bony abnormality." Record at 240-241. Dr. Samir Parikh noted that there was "a metallic screw within the medial malleolus"; he also noted a "small radiolucency . . . adjacent to the metallic screw in the medial malleolus, which could be post-traumatic." Record at 241. He also noted the presence of "tiny metallic fragments at the medial malleolus from either injury or surgery" and "irregular sclerosis involving the distal left fibula, which is most likely due to [the] old healed fracture." Record at 241. In sum, Dr. Parikh determined, the imaging revealed "no acute abnormality." *Id.*

Ms. Lawson returned to Dr. Ledbetter on December 11, 2007, with continued complaints of a painful left ankle. Record at 238. At that time, Dr. Ledbetter noted that Ms. Lawson had seen a neurologist, who "was not able to find anything significant." Record at 238. She also noted that Ms. Lawson had had an MRI, which "was positive for 6 mm osteochondral defect to the left talus"; her x-rays were normal. *Id.* Still, on physical examination, Ms. Lawson's ankle was "very tender especially in the dorsal aspect. . . ." Record at 238. Dr. Ledbetter diagnosed Ms. Lawson with an "osteopchondral defect left talus" and gave her an injection for her pain; she also had her casted for an "Arizona brace" to give more support in the area. Record at 238.

On January 21, 2008, Ms. Lawson returned to Dr. Keys' office, complaining of continued ankle pain. Record at 237. Dr. Keys noted that "[w]e have yet to get the Arizona brace approved and I would recommend we just do conservative care. She is requesting pain medication." Record at 237. Dr. Keys gave her a prescription for Vicodin ES and told her to return when her brace came in. Record at 237.

On February 14, 2008, Ms. Lawson returned to Dr. Ledbetter for "continued care of a painful left ankle"; she reported that "she is now walking so oddly on the left side she is starting to have some residual pain on the right side as well." Record at

236.  Ms. Lawson was fitted with the Arizona brace and instructed to wear it regularly and return in 2 weeks for reevaluation; she was also given another prescription for Vicodin ES and told to "take sparingly when the pain is bad."  Record at 236.  There are no records showing treatment after this date.

The record also shows that Ms. Lawson was evaluated and treated in the Sleep Disorder Clinic at Foote Hospital.  She was initially seen there on May 16, 2006, on referral from Dr. Davis, to address her complaints of nighttime shortness of breath and observed episodes of apnea.  Record at 196.  After examining Ms. Lawson, the nurse practitioner in the clinic diagnosed her with a sleep disorder, most consistent with obstructive sleep apnea; he recommended that she schedule a "polysomnogram sleep study to assess the severity of disease" and possible treatment options.  Record at 198.  Ms. Lawson participated in the sleep study on June 5, 2006; on being admitted to the clinic, she reported that she had not gotten much sleep the night before, that she had taken no medication, and that she had no pain issues.  Record at 191.  The study confirmed that Ms. Lawson had "moderate obstructive sleep apnea"; it was noted that she "slept for 5.4 hours of the 6.8 hour recording," but that "[s]leep continuity was severely disrupted with an average of 33 sleep disruptions per hour of sleep."  Record at 191.  The report from the study shows that Ms. Lawson had no significant EEG abnormalities and

normal sinus rhythm, but it also shows that the "distribution of sleep stage percentages was mildly abnormal." Record at 191. She was diagnosed with obstructive sleep apnea syndrome and advised to follow up in the sleep laboratory. *Id.*

Ms. Lawson returned to the clinic on June 28, 2006 for follow up; at that time, she reported that she was continuing to have "very scary apneic periods where she will stop breathing"; she also complained of "excessive daytime sleepiness." Record at 188. The nurse in the clinic recommended that she schedule "a night #2 CPAP titration" and noted that Ms. Lawson was "willing to undergo CPAP therapy." Record at 189.

On August 27, 2006, Ms. Lawson returned to the Sleep Clinic for a second night; the report from that night notes that, although Ms. Lawson had trouble falling asleep, once she did, her "sleep continuity was fairly good." Record at 182. Her "total apnea/hypopnea index, despite her poor sleep efficiency, improved from 28 events per hour to 7 events per hour"; it was noted that she "did have chronic pain." Record at 183. The report noted that Ms. Lawson "tolerated high levels of CPAP and BiPAP, which were quite effective objectively, and improv[ed] her quality of sleep." Record at 183. The report also noted that she had "persistent spontaneous arousals, which may have been due to the positive pressure or had resulted from her chronic pain." *Id.* It was recommended that she be "set up with BPAP and B-Flex mode

at 20/15 cm of pressure" and that she return to the clinic in a few weeks. *Id.*

Ms. Lawson returned to the clinic for follow-up on September 25, 2006; at that time, she complained of difficulties with using the CPAP machine at home – in particular, with wearing the mask. Record at 180-181. The clinic technicians worked with her mask, and she was also given a short-term prescription for Xanax, to be taken right before bedtime to lessen her anxiety with the mask, and she was prescribed Mirapex to address her potential restless leg syndrome. Record at 181. She was told to return in six weeks for follow up.

She returned to the Sleep Disorder Clinic on October 24, 2006, again complaining of problems using the CPAP machine at home. Record at 178. She reported that she continued to have trouble wearing the mask, and that she was only able to wear it for a couple of hours at a time. *Id.* She reported that the Xanax really did not help her tolerate the mask. *Id.* The clinician decreased the pressure on her mask and prescribed Requip in lieu of the Xanax and Mirapex; Ms. Lawson was told to get some lab work done and to see her regular family doctor "concerning other medical issues"; she was told to follow up in the Sleep Clinic in three months. Record at 179.

She returned to the Clinic on January 23, 2007, complaining of excessive daytime sleepiness and an inability "to tolerate

CPAP, BiPAP." Record at 213. At that time, she reported that her sleep was no better and that she was still unable to wear the CPAP most nights; she reported getting just a few hours of sleep each night and also reported "concerns over multiple medical problems mostly dealing with chronic back and leg pain which she has stated has become progressively worse." *Id.* The clinician recommended bringing Ms. Lawson back in to the clinic for "a night #3 for continuous positive airway pressure titration." Record at 214. She also recommended that Ms. Lawson see her "regular family doctor concerning other medical issues including this chronic back and leg pain that seem to be contributing to some of her sleep issues." Record at 214. Ms. Lawson returned to the clinic for a third overnight study on March 29, 2007. Record at 210. According to the report from that study, she spent 7.1 hours in bed and slept for 4.1 of those hours, with a 57% sleep efficiency rate and 27 interruptions per hour. Record at 210-212.

Ms. Lawson returned to the clinic on May 15, 2007 to follow up from the third night sleep study. At that time, she reported "doing fairly well"; she was able to wear the CPAP all night. Record at 208. The clinician reported that Ms. Lawson "seems cheerful today and appears much less sleepy, much more talkative than in previous exams." Record at 208. Progress notes show that, from the clinician's perspective, Ms. Lawson was "probably

26

as good as we can get her . . . ." Record at 209. She noted that Ms. Lawson had multiple other medical issues that are impacting her sleep, including back pain, dyspnea with activity, and lower extremity edema. She is being seen by Dr. Davis who is following up on those complaints." *Id*. She was instructed to continue doing what she was doing and to return to the clinic on an as-needed basis. She returned on September 24, 2007, with "complaints of chronic back and left foot pain, and multiple medical problems"; she reported that she was "unable to wear her CPAP because of all her pain issues" and she complained of excessive daytime sleepiness. Record at 206. The clinician encouraged her to wear the CPAP, noting that restorative sleep "might help with her pain issues." Record at 207. Again, she was advised to return to the clinic on an as-needed basis. There is nothing in the record to suggest that she sought any further care for her sleep issues.

The ALJ issued his decision on December 19, 2008, finding that Ms. Lawson had "not been under a disability within the meaning of the Social Security Act from March 3, 2006 through the date of the decision." Record at 9. The ALJ determined that Ms. Lawson met the insured status requirements of the Social Security Act through June 30, 2011, that she had not engaged in substantial gainful activity since March 3, 2006, and that she had the following severe impairments: obesity, post left ankle

fracture, high blood pressure, degenerative disc disease, asthma and sleep apnea. Record at 11. He determined, however, that her impairments – alone or in combination – did not meet or equal a listed impairment. Record at 13. After considering Ms. Lawson's Residual Functional Capacity, the ALJ then determined that, although she could not perform her past relevant work, she could perform other jobs existing in the national economy in substantial numbers – mail clerk, retail clerk, bench assembler to name a few representative occupations.

Ms. Lawson sought review of the ALJ's decision with the Appeals Council, Record at 127-128, and, on September 9, 2010, the Appeals Council denied review, Record at 1, making the ALJ's decision the final decision of the Commissioner. On October 25, 2010, Ms. Lawson filed a lawsuit in the United States District Court for the Northern District of Illinois seeking review of that decision. The parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on January 4, 2011. Thereafter, the parties filed cross motions for summary judgment: Ms. Lawson asks the Court to reverse the Commissioner's decision or to remand for further proceedings; the Commissioner asks the Court to affirm the decision to deny benefits.

## DISCUSSION

### Applicable Law

An individual claiming a need for DBI or SSI must prove that she has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine whether the claimant is currently employed; second, he must determine whether the claimant has a severe impairment; third, he must determine whether the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform her past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing other work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).
In reviewing an ALJ's decision for substantial evidence, the
Court may not "displace the ALJ's judgment by reconsidering facts
or evidence or making credibility determinations." *Skinner v.
Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v.
Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting
evidence allows reasonable minds to differ, the responsibility
for determining whether a claimant is disabled falls upon the
Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178,
181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate
and logical bridge from the evidence to his conclusions, so that
the Court may meaningfully review the SSA's ultimate findings.
*Steele*, 290 F.3d at 941. It is not enough that the record
contains evidence to support the ALJ's decision; if the ALJ does
not rationally articulate the grounds for that decision, or if
the decision is not sufficiently articulated, so as to prevent
meaningful review, the Court must remand. *Id.*

Analysis of Ms. Lawson's Arguments

Ms. Lawson argues that the ALJ's decision should be reversed
or remanded because: (1) he erred in discounting her credibility,
particularly with regard to her failure to lose weight or to stop
smoking; (2) he erred in determining her RFC; and (3) he failed
to consider the effects of her obesity.

30

1.   The ALJ's Credibility Determination

In the context of assessing Ms. Lawson's Residual Functional
Capacity, the ALJ determined that, although "her medically
determinable impairments could reasonably be expected to cause
the alleged symptoms," her statements "concerning the intensity,
persistence and limiting effects of these symptoms are not
credible to the extent they are inconsistent with the above
residual functional capacity assessment."  Record at 14.  The
Seventh Circuit has instructed that this boilerplate language,
without more, is unacceptable, as it fails to inform this Court
in a meaningful way of the specific evidence the ALJ considered
in assessing credibility.  *See Bjornson v. Astrue*, 671 F.3d 640,
645 (7th Cir. 2012).

In *Bjornson*, the Seventh Circuit held that this conclusory
language, drafted by the SSA for insertion into any ALJ opinion,
wrongly implies that ability to work is determined first and then
used to assess the claimant's credibility.  *Id.* at 644-45.  In
reality, the assessment of one's ability to work often depends on
the credibility of his statements concerning the "intensity,
persistence, and limiting effects" of his symptoms.  *Id.* at 645.
Accordingly, the court held that "an applicant's credibility
cannot be ignored in determining his ability to work."  *Id.* at
646.

The ALJ did go on to give some specific examples of

testimony and evidence he found to be incredible. Of particular significance to the ALJ seemed to be the fact that Ms. Lawson "testified she has breathing problems but continues to smoke." Record at 14. The ALJ also noted that, although Ms. Lawson testified that she used a cane every day, Dr. Sachdev noted that she "walked in and out of the office stably" – without mentioning a cane, and that, although she rated her pain at an 8/10, her October 2007 MRI was negative, with no significant interval chance since March 2004. *Id.* He also noted that the x-rays from May 2005, June 2007, September 2007 and November 2007 were all negative and normal, as were the MRIs from February 2007 and October 2007. *Id.* The ALJ also noted that Ms. Lawson's "style of life is not consistent with that of a person who is disabled or who believes her condition is life-threatening; he noted that she was "aware of the complicity of her smoking and her obesity in relation to her health," but had "not lost weight and continues to smoke." Record at 14. Taking judicial notice of the "massive body of medical opinion regarding the subject of cigarette smoking," the ALJ cited an opinion from the Sixth Circuit, in which the Court observed that "if the claimant in this case chooses to drive [herself] to an early [grave], that is her privilege – but if she is not truly disabled, she has no right to require those who pay social security taxes to help underwrite the cost of her ride." Record at 14 (citing *Sias v.*

*Secretary of Health and Human Services*, 861 F.2d 475 (6th Cir. 1988)). Ms. Lawson takes issue with this, and she challenges the ALJ's criticism of her failure to quit smoking or to lose weight.

It is not surprising that the ALJ cited a Sixth Circuit case, sitting, as he was, in Michigan. But the sentiment expressed by the ALJ is jarring when read in the Seventh Circuit, which does not take so harsh a line with smoking or obesity and does not treat so dismissively subjective complaints, even when they do not appear to be firmly grounded in objective medical evidence. *See, e.g., Shramek v. Apfel*, 226 F.3d 809, 812-13 (7th Cir. 2000)(continuing to smoke, despite doctor's instruction to quit, does not necessarily undermine claimant's credibility and may not, by itself, justify denial of benefits); *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004)(obesity is not *per se* a self-inflicted disability for which benefits should be denied); *Parker v. Astrue,* 597 F.3d 920, 922-923 (7th Cir. 2010)(subjective complaints of disabling pain cannot be discredited simply because of a lack of objective medical confirmation, though the lack of confirmation can factor into the analysis).

In fact, read from the perspective of a judge sitting in this Circuit, the ALJ was extraordinarily dismissive of Ms. Lawson's complaints — in large part, it appears because she had not quit smoking and had not lost weight. He seemed to suggest

33

that it was within her power to cure her impairments by doing so, and he seems to have held it against her that she did not take these steps.

Perhaps because of this predisposition, the ALJ discounted Ms. Lawson's credibility to an extent that seems unjustified. For example, he notes that she claimed to use a cane, but walked "stably" in and out of Dr. Sachdev's office. Although Dr. Sachev did say she walked "stably," he did not say whether she used an assistive device. Presumably he would have mentioned it if she had, but the possibility exists, given that he did not say for certain that she used no assistive device – especially if her credibility is going to be substantially undermined largely on the basis of this point.

Having said this, it is entirely possible that the result on remand will be the same – to be sure, there is a lot of evidence in the record on which an ALJ, with proper analysis, could justifiably discount Ms. Lawson's credibility. And, to be sure, there is a lot of evidence in the record to suggest that Ms. Lawson was out of work, not because her impairments rendered her unable to work, but because she was unable to keep any job she got; she consistently lost jobs for reasons that, by her own testimony, had nothing to do with her impairments. But, without any meaningful analysis, the Court is unable to trace the path of the ALJ's reasoning here and, as such, the decision cannot stand.

As an aside, it does appear from the record that Ms. Lawson had cut back significantly on her smoking – dropping from a high of a pack and a half a day to 3 cigarettes per day; and she explained that the smoking helped to alleviate her anxiety. Additionally, she, at times, denied smoking entirely, e.g., Record at 246, which suggests that she may even have quit, though possibly unsuccessfully in the long term. Considering the addictive power of cigarettes, Ms. Lawson would hardly be the first to be unable to kick the habit entirely – even if her health depended upon her doing so. Neither the Social Security Regulations nor the Seventh Circuit have suggested that this is a valid basis for denying benefits. And the same is true of a morbidly obese person who fails to lose weight – whether through no fault of her own, or in part as a consequence of her own actions.

The ALJ cited the objective findings in the record – the x-rays and the MRIs. Yet he failed to account for her subjective complaints, which were consistent in the record. The Seventh Circuit has repeatedly cautioned that this is inappropriate. Ditto the use of the boilerplate language employed here concerning statements about the intensity, persistence and limiting effects of the claimant's symptoms. *See, e.g., Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012). At bottom, this is a pain case, which will turn on the subjective complaints of

the claimant – making her credibility a primary consideration.
It should be carefully evaluated and explained, in the first
instance, by the ALJ, not the Court.  Accordingly, remand is
appropriate.

     2.   The ALJ's RFC Determination

     After considering the record, the ALJ determined that Ms.
Lawson had the residual functional capacity

> to lift or carry a maximum of 20 pounds occasionally
> and 10 pounds frequently.  In an eight-hour workday,
> the claimant can walk or stand for six hours and sit
> for six hours.  The claimant needs the option to sit of
> stand at will.  She should never use ladders.  The
> claimant can only occasionally use ramps or stairs,
> stoop, kneel, crouch or crawl.  She can do no
> commercial driving.  The claimant can not use a left
> foot pedal.

Record at 13.  Based upon this RFC, the ALJ determined that Ms.
Lawson could not perform her past relevant work, as all of her
past jobs required her to lift more than 20 lbs., required her to
use ladders and did not afford a sit/stand option.  Record at 15.
He determined, however, that, considering Ms. Lawson's age,
education, work experience and residual functional capacity,
there are jobs that exist in significant numbers in the national
economy that she could perform, including mail clerk, retail
clerk and bench assembler.  Record at 15-16.  In making this
determination, the ALJ relied upon the testimony of the
Vocational Expert.

     Ms. Lawson argues that the ALJ had no medical basis for his

RFC determination; that he failed to explain what evidence he relied upon in crafting this RFC; and that he failed to consider her need to elevate her legs when crafting this RFC. And all of these concerns appear to have merit. To be sure, there is nothing in the record to suggest that Ms. Lawson could walk or stand for six hours and sit for six hours – no doctor determined that she could do so, and certainly she said quite the opposite. Heide Schonle, who completed the Physical Residual Functional Capacity Assessment on June 14, 2006, determined that Ms. Lawson could stand and walk for 6 hours in an 8-hour day and that she could sit for about 6 hours in an 8-hour day. Record at 149. But she also noted Ms. Lawson's statements to the contrary; she noted that Ms. Lawson said it was "hard to sit and stand," that she can't walk a ½ block" and that she can only lay in bed." Record at 153. Ms. Schonle also noted that "[t]here is no objective medical information to support clmts above stated complaints." *Id.* And the ALJ may have agreed with this. But he should have explained that he was basing his RFC determination on this assessment – especially because he clearly rejected some of her findings (notably, the finding that Ms. Lawson could occasionally lift 50 lbs. and frequently lift 25 lbs.). If the ALJ is going to pick and choose bits and pieces from different assessments, he at least has to explain that he is doing so, and why. Such an explanation is totally lacking here.

3.   The Effects of Ms. Lawson's Obesity

Finally, Ms. Lawson argues that the ALJ failed to analyze her obesity in combination with her other impairments.  In assessing Ms. Lawson's ability to work, the ALJ acknowledged at the outset that she had the following severe impairments: obesity, post left ankle fracture, high blood pressure, degenerative disc disease, asthma and sleep apnea.  He clearly recognized her obesity.  And he relied upon the findings of Dr. Sachdev, who also considered her obesity in his assessment; in fact, Dr. Sachdev noted that Ms. Lawson was "morbidly obese" and he noted that there was "a significant element of deconditioning."  Record at 145.  Having said this, given the Court's determination above concerning the ALJ's credibility and RFC determinations, it is almost impossible to say whether the ALJ actually took her obesity into account; as explained it is not clear exactly what he took into account.  Accordingly, remand is appropriate on this issue as well.

**CONCLUSION**

For the reasons set forth above, the Court grants Ms. Lawson's Motion for Summary Judgment [#24] and denies the Commissioner's Motion for Summary Judgment [#26].

Dated: May 8, 2012

                              E N T E R:


                              _Arlander Keys_____
                              ARLANDER KEYS
                              United States Magistrate Judge